IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

K.S., a minor, by and through her parents, P.S. and M.S.,

             Plaintiff,

  v.

FREMONT UNIFIED SCHOOL DISTRICT,

             Defendant.

_____/

No. C 06-07218 SI

**ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING CASE TO OFFICE OF ADMINISTRATIVE HEARINGS**

On February 15, 2008, the Court heard argument on the parties' cross-motions for summary judgment. Having considered the arguments of counsel and the papers submitted, and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART each motion, and REMANDS for reconsideration of the remaining issues.

**BACKGROUND**

This is an action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. Plaintiff K.S., a minor, by and through her parents, P.S. and M.S., seeks judicial review of an ALJ decision which found that defendant Fremont Unified School District ("the District") provided plaintiff with a free and appropriate public education ("FAPE") designed to meet her unique needs for the 2003-04, 2004-05 and 2005-06 school years. Plaintiff also seeks reversal of a sanctions award against plaintiff's counsel. Plaintiff is an eight-year-old child diagnosed with autism spectrum

disorder. Specifically, plaintiff alleges that the individualized education program ("IEP") designed for plaintiff failed to include appropriate speech therapy, one-to-one support, and behavioral, academic, self-help, auditory processing and motor control services. *Id.*

### 1.    The Individuals with Disabilities Education Act

Congress passed the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). To achieve this goal, the Act relies on a cooperative process between parents and schools. *See generally Schaffer ex rel. Schaeffer v. Weast*, 546 U.S. 49, 53 (2005). Central to this cooperative process is the IEP.

An IEP is created for every disabled student, and serves as a road map for the student's education. *Schaffer*, 546 U.S. at 53-54; *see also* 20 U.S.C. § 1414. "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Id.* at 53. State educational authorities have a duty to identify and evaluate disabled children and develop an IEP for each one. *Id.* In addition, IEPs must be reviewed at least once a year. *Id.*

> Parents play a significant role in the IEP process. As the Supreme Court explained: [Parents] must be informed about and consent to evaluations of their child under the Act. [20 U.S.C.] § 1414(c)(3). Parents are included as members of "IEP teams." § 1414(d)(1)(B). They have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child." § 1415(b)(1). They must be given written prior notice of any changes in an IEP, § 1415(b)(3), and be notified in writing of the procedural safeguards available to them under the Act, § 1415(d)(1). If parents believe that an IEP is not appropriate, they may seek an administrative "impartial due process hearing." § 1415(f).

*Id.* If the parents of a disabled student do not prevail at the administrative due process hearing, they may, as plaintiffs here have done, seek review through a civil action in state or federal court. 20 U.S.C. § 1415(i)(2).

## 2.       Factual and Procedural Background

The undisputed facts are as follows.  Plaintiff is an eight-year-old girl who was diagnosed with autism spectrum disorder when she was about three-and-a-half years old.  She has significant deficits in the areas of speech and language, reading, handwriting, behavior, fine and gross motor functioning, generalization, social skills, and all academic subjects.  She is only beginning to express herself verbally.  She is incontinent in stool and urine.  She sometimes engages in self-stimulation and other problem behaviors such as kicking, scratching, and biting.  Her attention span is so short that it renders her unable to focus on most tasks.  According to the Mullen Scales of Early Learning, first given to plaintiff when she was six years old, plaintiff's language skills were below that of an average one year old, and her motor and visual reception skills were equivalent to that of a two year old.   Plaintiff has scored below the first percentile on the Vineland Adaptive Behavioral Scales.

Plaintiff is eligible for special education services under the "autistic-like" category set forth in the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA") at 20 U.S.C. § 1401(3)(A) and the California Code of Regulations § 3030(g).  Plaintiff started elementary school in the District in May 2002.  At that time, it was determined that plaintiff needed special and intensive education because she could not use words to communicate with her family or teachers, she had problems with her dexterity and coordination, and could not take care of her own hygiene needs.  She also suffered from an auditory processing disorder, was unable relate to others appropriately and had problems controlling her behavior.  In an IEP dated October 2, 2002, plaintiff's parents and the District agreed upon a placement for plaintiff in a preschool Special Day Class (SDC) for the 2002-2003 school year.  That IEP is not in dispute here.[1]

---

[1] Although plaintiff alleged in her complaint and amended complaint that the District denied her a FAPE for the 2002-2003 school year, plaintiff has not alleged or argued anywhere that the IEP for the 2002-2003 school year was inappropriate or that the District failed to provide her with appropriate services during the 2002-2003 school year.  The first IEP plaintiff alleges was inadequate was in June

**United States District Court**

For the Northern District of California

In June 2003, plaintiff's parents and the District agreed upon an IEP that placed plaintiff in a preschool for the summer, and a kindergarten SDC for autistic children for the 2003-2004 school year. The June 2003 IEP and those subsequent to it were closely similar to the IEP for the 2002-2003 school year. Plaintiff's parents disagreed with subsequent IEPs for the school years in question, either signing the IEP agreement with exceptions noted, requesting additional services, or not consenting to the IEP at all. *See* OAH Decision at ¶¶ 6-13.

On May 11, 2006, plaintiff filed for a due process proceeding against the District pursuant to the IDEA and California Special education law. The crux of plaintiff's complaint is that the IEPs were not designed to meet her unique needs and as a result, plaintiff made only minimal progress and was thereby denied a FAPE. Plaintiff sought an order that the District provide plaintiff with 30 to 35 hours a week of one-to-one instruction supervised by a behaviorist. On August 24, 2006, Administrative Law Judge ("ALJ") Charles Marson found that in light of the nature and extent of her disabilities, plaintiff had made meaningful progress under the District's IEPs during the years at issue and denied plaintiff's requests for relief. Both plaintiff and defendant have filed motions for summary judgment based on review of the ALJ's decision.

2003 for the following summer and school year. The ALJ limited the issues accordingly, only addressing whether the District had provided a FAPE to plaintiff in the school years 2003-2004, 2004-2005, and 2005-2006. *See* OAH Decision at ¶ 1.

**LEGAL STANDARD**

A district court reviewing the decision of an administrative due process hearing under the IDEA sits in an unusual position. The statute provides that a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). By allowing a district court to consider materials outside the administrative record and by imposing a preponderance of the evidence standard of review, the IDEA allows a district court to conduct a more searching review than is typical of agency decisions.

While a district court's review under the IDEA is therefore less restricted than its review of other administrative decisions, the Supreme Court has made clear that this is in no way permission for "courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034 (1982). Rather, courts must give "due weight" to the state court proceedings. *Id*. A court must consider the administrative findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue, but the court is free to accept or reject the findings in part or in whole." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (internal quotation marks omitted).

Ultimately, the degree of deference to give the hearing officer's determination is a matter of district court discretion. *See Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1474 (9th Cir. 1993). Various factors affect how much deference should be afforded the administrative decision. "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Wartenberg*, 59 F.3d at 892; *see also County of San Diego v. Calif. Special Ed. Hearing Office*, 93 F.3d 1458, 1466

5

1   (9th Cir. 1996) ("This circuit gives the state hearing officer's decision substantial weight when it evinces

2   his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity

3   of the issues presented.") (quotation marks and citations omitted).  In addition, "a reviewing court that

4   has before it evidence not considered at the administrative level will naturally defer less to the

5   administrative decision . . . ." *Sch. Dist. of Wis. Dells v. Littlegeorge*, 295 F.3d 671, 675 (7th Cir. 2002).

6          A district court's review should focus on both procedural and substantive aspects of the decision

7   below:  "First, has the State complied with the procedures set forth in the Act? And second, is the

8   individualized educational program developed through the Act's procedures reasonably calculated to

9   enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206-07.  The moving party bears

10  the burden of proving that the ALJ's decision was contrary to preponderance of evidence.  *Clyde K. v.*

11  *Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

12

13                                    **DISCUSSION**

14         As a preliminary matter, the Court must determine the level of deference it should afford the

15  ALJ's decision.  In this instance, the Court finds that the ALJ's decision is entitled to considerable

16  deference.  The ALJ heard a great deal of evidence, holding a hearing that took place over eight days

17  during a span of two and a half weeks.  Index of Administrative Record Under Seal ("Index"), vol. 1

18  at 1.  In total, thirteen witnesses testified at the hearing, *id.*, vol 5, tab 12 at 2803, producing a

19  voluminous hearing transcript of almost 2000 pages and over 500 pages of exhibits, *id.* vol. 1 at 1.  After

20  carefully considering the evidence, the ALJ produced a 40-page order detailing the factual and legal

21  bases for his decision.  In the Court's view, both the diligence with which the ALJ approached this task,

22  and the administrative expertise that the ALJ represents, weigh heavily in favor of considerable

23  deference to the ALJ's findings.  *See County of San Diego v. Calif. Special Ed. Hearing Office,* 93 F.3d

24  at 1466 (holding that deference to hearing officer's decision is highest when that decision is thoughtful,

and careful); *Wartenburg*, 59 F.3d at 892 ("[D]eference to the hearing officer makes sense in a proceeding under [the IDEA] [because of] agency expertise, the decision of the political branches . . . to vest a decision initially in the agency, and the costs imposed on all parties of having still another person re-decide the matter from scratch.") (internal quotation marks omitted). However, as discussed below, certain of the ALJ's findings are entitled to little or nor deference where the ALJ committed legal error.

Plaintiff asserts four basic arguments. First, plaintiff contends that the ALJ exhibited bias in his credibility determinations which resulted in misplaced reliance on defendant's witnesses, and an allegedly erroneous determination that the little progress plaintiff made was significant in comparison to her alleged limited capabilities. Second, plaintiff argues that this allegedly erroneous determination was the crux of the ALJ's finding that plaintiff had received a meaningful educational benefit and a FAPE. Third, plaintiff asserts that the ALJ erred on the issue of whether the District denied plaintiff's parents the right to meaningfully participate in the IEP process. Finally, plaintiff contends that the ALJ's award of sanctions in the amount of $300.00 against plaintiff's counsel for filing a motion for clarification should be reversed because there was no subjective bad faith as a matter of law. The Court considers each of these arguments in turn.

**1.        Credibility determinations**

Plaintiff contends that the ALJ inappropriately relied primarily on defendant's witness, Dr. Susan Clare, to determine that plaintiff's low rate of progress in school would be consistent with plaintiff's cognitive abilities. Plaintiff argues that the reliance was inappropriate for two reasons. First, plaintiff contends that Dr. Clare does not have the expertise or experience to make a determination about plaintiff's cognitive abilities, and that her determination was contrary to documentary evidence and expert testimony. Second, plaintiff contends that the ALJ's negative credibility determinations with

regard to plaintiff's experts, who disagreed with Dr. Clare's conclusion that plaintiff had made meaningful progress, had no valid ground.

### A.     Dr. Clare's expertise

On October, 2004, at plaintiff's parents' request, the Autism Spectrum Disorders Clinic of Kaiser Permanente administered to plaintiff the Mullens Scales of Early Learning and other tests to assess her development.  The ALJ found that Dr. Clare credibly testified that the Mullen results "support the conclusion that [plaintiff's] cognitive abilities are in the 'severe to profound' range of mental retardation." OAH Decision at ¶ 19.  In finding that plaintiff had received a FAPE, the ALJ relied on Dr. Clare's testimony that a low rate of progress in school would be consistent with plaintiff's cognitive abilities, and based on that low expectation, plaintiff's records showed significant improvement over time. *Id*. ¶¶ 16, 21.  Plaintiff argues that the ALJ improperly relied on Dr. Clare's testimony that plaintiff was severely mentally retarded because Dr. Clare is not a cognitive expert, she had not personally evaluated plaintiff, and the Kaiser evaluation specifically noted that an accurate measure of plaintiff's IQ had not been obtained.[2]

The IDEA specifically notes that its implementation "has been impeded by low expectations," 20 U.S.C. 1400(c)(4)), and that "[a]lmost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by having high expectations for such children," 20 U.S.C. 1400(c)(5)(a).  Although it is true that "the benefits obtainable by children at one

---

[2]  Although plaintiff did not object during the hearing to Dr. Clare's testimony that plaintiff likely suffers from severe to profound mental retardation, the Court will consider the objection now because it was improper for the ALJ to rely on a single expert's estimation of severe mental retardation when her qualifications for making such an estimation had not been established and other qualified experts disagreed. Furthermore, since Dr. Clare's estimation of plaintiff's mental retardation constituted only a small portion of her testimony, most of which focused on the adequacy of the educational program, plaintiff likely did not expect the ALJ's decision to hinge on the issue of whether plaintiff is severely mentally retarded.

end of the spectrum will differ dramatically from those obtainable by children at the other end," *Rowley*, 458 U.S. at 202, the IDEA suggests that courts must be careful to avoid finding that a disabled child is incapable of making much progress unless there is significant evidence to that effect.

The Court agrees that Dr. Clare's testimony alone was insufficient to warrant the ALJ's determination that plaintiff was severely mentally retarded and incapable of making additional progress at school. The record does not show that Dr. Clare was qualified to make that cognitive assessment. The ALJ noted Dr. Clare's credentials as follows:

> Dr. Clare . . . was most recently a private psychologist and educational consultant. She has a Bachelor of Science degree in Speech Pathology and Audiology from the University of Kansas, a Master of Educational Psychology from the University of Utah. She is board-certified as a school psychologist, a behavior analyst, and a psychologist. She has worked as a speech pathologist and therapist in numerous school districts since 1966. Her career in speech pathology and audiology has centered on autistic children. . . . In California she established a program for the acquisition of language and social skills by autistic preschoolers at the Clovis Unified School District, where she worked for 16 years as a school psychologist. She taught a university-level class called "Teaching Language to Autistic Children" in Oregon and a class on teaching autistic children at Utah State University. . . .

OAH Decision at ¶ 17. The record indicates that Dr. Clare had a "concurrent" private psychology practice for "about three to four years." While Dr. Clare is clearly qualified to opine on educational programs for autistic children, nothing in the record establishes a foundation for Dr. Clare's experience, expertise or credibility with reference to performing cognitive evaluations. Furthermore, plaintiff's expert witness, Dr. Howard Friedman, who is a clinical neuropsychologist with "substantial experience in neuropsychological assessment," OAH Decision at ¶ 47, disagreed with Dr. Clare's estimation and provided evidence that Dr. Clare's interpretation of plaintiff's age equivalent scores was wrong, Decl. of Dr. Howard Friedman at ¶¶ 12-15.[3] Additionally, the Kaiser evaluations on which Dr. Clare based

---

[3] Defendants objected to Dr. Friedman's declaration submitted on January 14, 2008, because it was an unsworn statement. However, plaintiff subsequently submitted a sworn declaration by Dr. Friedman on February 4, 2008, which is the document the Court refers to.

her estimation specifically declined to make a finding of mental retardation.  Index, vol. 7, tab 17 at 3690; index, vol. 5, tab 11 at 2501.  Significantly, Kaiser noted,

> there are a few caveats about assessing young children with special needs.  It is difficult to find measures that have been normed on special populations.  Administration often requires modification of instructions to accommodate the child, which alters the reliability and validity of the instrument and limits the inferences that can be made.  Such was the case for [plaintiff] as several attempts were used to help her attend to and understand what was being asked of her.

Index, vol. 7, tab 17 at 3686.

Finally, the ALJ's acceptance of Dr. Clare's testimony was influenced by his rejection of opposing testimony provided by plaintiff's witnesses.  As discussed below, the ALJ's negative credibility determination as to Dr. Friedman and plaintiff's other witnesses who disagree with Dr. Clare's assessment constituted legal error.

Accordingly, the Court rules that the ALJ must reconsider his finding that plaintiff is severely mentally retarded and incapable of more significant progress then she has made to date.  Such a finding creates a low expectation of plaintiff and will affect the educational programs she receives for the rest of her life.  Therefore, this finding must be based on more evidence than the testimony of a single and apparently unqualified witness.  If on remand the ALJ finds it necessary to make a determination that plaintiff is severely mentally retarded and incapable of more significant progress, the ALJ should hear more evidence on this issue from both parties.

## B.    Negative credibility determinations

Four of plaintiff's witnesses testified that plaintiff did not make meaningful progress during the school years at issue.  OAH Decision at ¶ 45.  Although the ALJ found these witnesses to be "well credentialed and articulate," he found their testimony less credible than that of the District's witnesses.

*Id.* ¶¶ 45-46. Plaintiff contends that the ALJ's negative credibility determinations were improper as a matter of law.

"Normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding." *Ms. S. ex rel. G. v. Vashon Island Sch. Dist*. 337 F.3d 1115, 1127 (9th Cir. 2003); *see also Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (finding, in the IDEA context, that the administrative hearing officer "who receives live testimony is in the best position to determine issues of credibility"). A district court should accept the ALJ's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citations and quotations omitted); *see also Arulampalam v. Ashcroft*, 353 F.3d 679, 685 (9th Cir. 2003) ("While we accord substantial deference to an IJ's credibility finding[,] . . . [w]hen the IJ provides specific reasons for the questioning of a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible.") (quotation marks and citations omitted)*; Gao v. Bd. of Immigration Appeals*, 482 F.3d 122, 127 (2d Cir. 2007) ("credibility determinations that are based on the IJ's analysis of testimony, as opposed to demeanor, are granted less deference").[4] Nonetheless, a district court is not required to accept any findings by the ALJ which are arbitrary and capricious or an abuse of his discretion. *See Aguilar-Cota v. INS* 914 F.2d 1375, 1381 (9th Cir. 1990) ("[T]here must be a rational and supportable connection between the reasons cited and the conclusion that the petitioner is not credible.").

The ALJ found the four witnesses who testified for plaintiff less credible for three reasons. First,

---

[4] Defendant argues that Ninth Circuit law regarding immigration cases does not apply here. This argument is meritless. Decisions by an immigration judge ("IJ") receive *greater* deference than decisions by administrative judges in the IDEA context. It therefore follows that standards applicable to the review of an IJ's credibility determinations can certainly be applied in the IDEA context.

they had limited personal experience with plaintiff. The ALJ reasoned that "progress is measured over time; it cannot be assessed on a single occasion" and noted that each of the four witnesses had spent no more than one to two-and-a-half hours assessing plaintiff in person. *Id.* ¶¶ 46-50. The ALJ felt that the opinions of defendant's witnesses were "entitled to substantially greater weight" because they were based on "extensive personal experience gained every school day over a period of years." *Id.* ¶ 51.

Second, plaintiff's four witnesses who saw no significant improvement "depended heavily in forming their opinions of [plaintiff's] progress on their reviews of her school records." *Id.* ¶ 52. The ALJ found their analyses to be flawed because (a) they "contradicted the testimony [that plaintiff made significant progress] of the people who created the records"; (b) they assumed "that inconsistencies in [plaintiff's] records must have resulted from poor or incoherent data collection"; and (c) their analyses contradicted the records themselves which, when "read as a whole in light of [plaintiff's] disabilities, demonstrate significant progress." *Id.* ¶¶ 53-55.

Third, these witnesses relied on information provided by plaintiff's parents. *Id.* ¶ 56. The ALJ found this reliance discrediting because (a) at least some of the information that parents provided to their experts was incorrect, (b) the weight of the evidence showed that plaintiff's parents "did not always understand [plaintiff's] curriculum," and (c) the father's credibility was lessened by inconsistencies in his testimony and his lack of objectivity as plaintiff's advocate. *Id.* ¶ 56. Here the ALJ's negative credibility determinations were based primarily on non-testimonial substantive issues.

Plaintiff asserts and the Court agrees that the ALJ's central basis for his determination – that the analyses of plaintiff's witnesses were not credible because they contradicted the District's witnesses' interpretation of their own records – is flawed. As authority, plaintiff cites *Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993), for the proposition that giving deference only to school personnel based on their personal experience with a student and their perspective of the record would eliminate the need for a due process hearing. In *Ojai*, a school district and superintendent opposed an

OAH decision that a student had not received a FAPE. *Id*. at 1471. The district and superintendent "relied primarily on the testimony of [the students's] teachers . . . who stated that [the student] had made progress under their tutelage." *Ojai*, 4 F.3d at 1476. The Ninth Circuit upheld the OAH decision, stating that it refused to ignore "the substantial contrary evidence upon which the hearing officer relied" and noted that "if the views of the school personnel regarding an appropriate educational placement for a disabled child were conclusive, then administrative hearings conducted by an impartial decisionmaker would be unnecessary." *Id*.

Here, the ALJ's determination that witnesses who had opinions contrary to the District's position were less credible was improper because the District's position is the root of the controversy between the parties. Finding witnesses more credible simply because they agree with the District's position constitutes a serious error in reasoning.

Plaintiff further contends, and the Court agrees, that the ALJ's reasoning that the lack of extensive personal contact between parents' witnesses and plaintiff made their analyses of the record less credible, was arbitrary and capricious because it applied a separate and higher standard to plaintiff's witnesses.[5] Common sense dictates that witnesses on both sides should be held to the same standards. Plaintiff points out that Dr. Clare, the District witness whom the ALJ found most credible, had no contact whatsoever with plaintiff and based her analysis entirely on the school record. Plaintiff asserts, and the Court agrees for reasons stated above, that the ALJ's rationalization for this inconsistency – that

---

[5] Plaintiff also asserts that the ALJ's reasoning for dismissing parents' experts' testimony "defies special education law." Pl's. Opp. at 4. As authority, plaintiff cites California Education Code § 56329(c) which states that "if the parent or guardian obtains an independent educational assessment at private expense, the results of the assessment . . . may be presented as evidence at a due process hearing"); and *Schaffer ex rel. Schaeffer v. Weast*, 546 U.S. 49, 60-61 (2005) ("IDEA . . . ensures parents access to an expert who can evaluate all the materials . . . and who can give an independent opinion. They are not left to challenge the government . . . without an expert with the firepower to match the opposition."). Although both of these authorities provide that independent educational assessments may be presented as evidence in a due process hearing, they do not preclude a judicial officer's use of discretion when determining the credibility of the evidence or the experts.

Dr. Clare's analysis was consistent with the record created by the District and the opinions of other District witnesses – is illegitimate.[6] As plaintiff states, "if such reasoning was a legitimate basis for a credibility determination, then no student would ever be able to prevail against a school district because school districts would merely hire experts to corroborate the school district's version." Pl's. Mot. at 13. Furthermore, district staff will nearly always have had substantially more personal interaction with students than any independent evaluator will have, and the ALJ's rationale would essentially "doom every student case." Pl's. Mot. at 13.

Finally, plaintiff asserts that the ALJ's negative credibility determination of plaintiff's father based on his role as advocate for his daughter was inappropriate because all parents who take part in the IEP process are advocates for their child and, under the IDEA, are rightly so. For authority, plaintiff cites *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 127 S.Ct. 1994, 2003 (2007) ("Without question a parent of a child with a disability has a particular and personal interest in fulfilling 'our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.'") (citing 20 U.S.C. § 1400(c)(1)). Plaintiff argues that supporting the ALJ's rationale "would seriously undermine the ability of a parent of a disabled student to obtain the protections provided under the [IDEA]." Pl's Mot. at 16.

The Court agrees with plaintiff and further notes that the ALJ's determination was arbitrary and capricious because he did not apply that standard equally to the District's witnesses, who were advocating for the District's program. All of the District's witnesses aside from Dr. Clare were part of the team that either developed or implemented the IEPs, or both, and had an interest in showing that their efforts as educators were effective. In other words, these witnesses were advocating on behalf of

---

[6] The ALJ noted, "Parents attack the testimony of Dr. Clare because it also depended on her review of [plaintiff's] records. But there is a key difference: Dr. Clare's testimony was consistent with the records and with the testimony of those who created them. Her testimony, their testimony, and the records are mutually reinforcing." OAH Decision at ¶ 55 n.5.

the District, but the ALJ did not find them less credible on this ground.

Although the ALJ provided additional undisputed reasons for his credibility determinations, the Court cannot speculate as to which reasons swayed the ALJ in his decision that plaintiff had received a FAPE or whether he would make a similar decision in the absence of the invalid reasoning. *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (remanding social security case because the ALJ was in a better position to determine if specific and legitimate reasons existed for disregarding testimony of a witness). In recognition of the fact that courts lack the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy," and "must be careful to avoid imposing their view of preferable educational methods upon the States," *Rowley*, 458 U.S. at 207-08, the Court remands the case to the ALJ for findings and conclusions consistent with appropriate credibility determinations, *see Somoza v. New York City Dept. of Educ.*, 475 F. Supp. 2d 373, 391 (S.D.N.Y. 2007) (noting on remand of an IDEA action that "courts tend . . . to return the decision to the agency in order to rely on the agency's expertise and protect the integrity of the administrative process") (internal quotations and citations omitted); *Anthony v. District of Columbia*, 463 F. Supp. 2d 37, 43-44 (D.D.C. 2006) (remanding IDEA action to the hearing officer for reformulation of a compensatory education award); *Hammond v. District of Columbia*, No. CIV.A.99-1723, 2001 WL 34360429, at *8 (D.D.C. March 1, 2001) (remanding IDEA action to the hearing officer for further consideration and for findings and conclusions consistent with the applicable burden of proof).

Accordingly, the Court DENIES IN PART defendant's motion for summary judgment and GRANTS IN PART plaintiff's motion for summary judgment on the issue of the ALJ's negative credibility determinations and his reliance on Dr. Clare's testimony that plaintiff is severely mentally retarded and had therefore made meaningful progress. The Court REMANDS for redetermination of whether plaintiff received a FAPE in accordance with this ruling.

1

2    **2.      Plaintiff's receipt of a FAPE**

3           The ALJ based his ruling that plaintiff had received a FAPE on his conclusions that plaintiff was

4    severely mentally retarded, and that the little progress plaintiff had made was meaningful because

5    plaintiff was incapable of significant progress.  These conclusions were influenced by his erroneous

6    credibility determinations and his erroneous reliance on Dr. Clare's estimation that plaintiff is severely

7    mentally retarded.  Indeed, many of the witnesses he discredited disagreed as to whether meaningful

8    progress had been made.  Because on remand the ALJ must reconsider, after conduction proper

9    credibility determinations, whether plaintiff had received a FAPE, the Court need not address this

10   question here.

11

12   **3.      Parental participation**

13          The ALJ found that "[t]he evidence did not support plaintiff's contention that their participation

14   in the decision-making process was impeded by the District."  OAH Decision at ¶ 130.  Plaintiffs argue

15   that although the parents were present at IEP meetings and had the opportunity to express their concerns

16   to the IEP team, those concerns were never in fact considered because the District had a pre-determined

17   program.

18          One of the procedural requirements of IDEA is that the IEP team must include a parent,

19   20 U.S.C. § 1414(d)(1)(B)(i); 34 C.F.R. § 300.344(a)(1); Cal. Ed. Code § 56341 subd. (b)(1), and must

20   consider the concerns of the parent throughout the IEP process, 20 U.S.C. §§ 1414(c)(1)(B),

21   (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. § 300.343(c)(2)(iii); Cal. Ed. Code § 56341.1 subd. (a)(1). The

22   Ninth Circuit has interpreted this to mean that parents must have the opportunity for meaningful

23   participation in the formulation of IEPs.  *See Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317

24   F.3d 1072, 1078 (9th Cir. 2003) ("The Act imposes upon the school district the duty to conduct a

16

**United States District Court**
For the Northern District of California

meaningful meeting with the appropriate parties.") (quoting *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, Missoula, Mont.*, 960 F.2d 1479, 1483 (9th Cir. 1992)). Thus, "[a] school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." *Ms. S. ex rel. G. v. Vashon Island Sch. Dist*, 337 F.3d 1115, 1131 (9th Cir. 2003) (finding meaningful parental participation when the parent joined in the IEP process but disagreed with the resulting IEP and requested a due process hearing to determine its validity) (superseded by statute on another point of law). However, a district's failure to implement a parent's requests does not necessarily violate IDEA because "although the formulation of an IEP is ideally to be achieved by consensus among the interested parties at a properly conducted IEP meeting, sometimes such agreement will not be possible." *Id*. When there is no agreement, a district should create a plan to the best of its ability based on the information it has and provide the parent with the opportunity to challenge the IEP at a due process hearing. *Id*.

Plaintiff argues that although her parents were present at the IEP meetings, their opinions were not considered in determining the operative portions of the IEP because the District had an unofficial policy of refusing to provide one-to-one outside applied behavioral analysis ("ABA") programs and had already decided plaintiff's placement and educational methodology. As support, plaintiff points to evidence that plaintiff's parents brought independent assessments and reports to the IEP team which should have triggered changes, and that plaintiff's IEP did not change substantially during over the years despite her parents' and expert opinion that the District's program was not meeting plaintiff's needs. Plaintiff cites to no other evidence.

Here, the ALJ found that the parents had participated in IEP meetings, had the opportunity to voice their concerns and suggestions, and that the District considered the merits of the parents' suggestions before finalizing the IEPs. Specifically, the ALJ determined:

One or both parents attended every IEP meeting, expressed their views freely, and

17

usually wrote comments on . . . the IEP. The District called some IEP meetings specifically to consider their views. Parents and [plaintiff's teacher Ms.] Martinez maintained a written communications log in which they corresponded about Student over the years at issue. The correspondence is extensive, and shows that Martinez was fully responsive to Parents' concerns, although she did not always accede to their wishes. Father was in the [classroom] twice a week . . . and testified he felt that Martinez was always approachable and could be questioned. Through periodic report cards, voluntary written and oral reports, and frequent written and oral communications, the District adequately communicated Student's progress to Parents. At all times, Parents had adequate written notice of proposed changes in Student's program, or of any consideration and subsequent rejection of their proposals. . . . . Parents submitted the reports of numerous private consultants, all of which Martinez, as Student's case manager, read and considered. . . . [The District] fully considered Parents' views and proposals, and agreed with and implemented some of them. The District rejected others on their merits.

*Id*. at ¶¶ 130-131.

The Court finds that the communication log between plaintiff's parents and Martinez shows clearly that the parents participated meaningfully in the IEP planning process, that the school personnel seriously considered the parents' input and in some cases made changes to the program accordingly. *See* Index, vol. 6, tab 15, 3384-3429. For example, Martinez told plaintiff's parents that "the Program Specialist would like to receive a written recommendation from [their] outside Speech Therapist to help determine the most appropriate speech services for [plaintiff] at school," and noted that she had not filed plaintiff's IEP because she was waiting for input from the outside speech therapist that parents had hired. *Id*. at 3385-86. After meeting with the outside speech therapist, Martinez revised plaintiff's program based on the speech therapist's suggestions. *Id*. at 3399. In response to the parents concerns regarding the 'Review of Speech and Language Services,' Martinez noted she had a difference of opinion but would forward their concerns to the Program Specialist, and suggested that they come observe plaintiff at school so they could see what kind of program is in place for her, and then hold a meeting with the IEP team to further discuss their concerns. *Id*. at 3391. Numerous other exhibits in the record support the ALJ's finding that the District actually considered the parents' concerns, and

when the District deemed appropriate, altered plaintiff's program accordingly. *See, e.g.*, Index, vol. 6, tab 13 at 3567-69, 3573; tab 15 at 3403, 3405, 3409.

IDEA does not require a district to comply with every parent request, but to seriously consider the parents' concerns, and when there is no agreement, provide the parent with the opportunity to challenge the IEP at a due process hearing. *Ms. S. ex rel. G. v. Vashon Island Sch. Dist*, 337 F.3d at 1131. A preponderance of the evidence supports the ALJ's decision that the District has met the meaningful parental participation requirement of IDEA. Accordingly, the Court DENIES plaintiff's request for summary judgment on the issue of parental participation.

**4.     Sanctions award against plaintiff's counsel**

Plaintiff contends that the ALJ's award of sanctions should be reversed. Defendant asserts that the sanctions should be affirmed and that, in any event, plaintiff does not have standing to contest a sanctions award against her attorneys.

**A.     Standing**

The Ninth Circuit has made clear that a party lacks standing to appeal an order imposing sanctions against his or her attorney. *Berg v. Popham*, 412 F.3d 1122, 1130 (9th Cir. 2003) (applying *Cabrera v. Huntington Park*, 159 F.3d 374, 382 (9th Cir. 1998)); *Estate of Bishop v. Bechtel Power Corp.*, 905 F.2d 1272, 1275-76 (9th Cir. 1990). However, Federal Rule of Appellate Procedure 3(c), which governs the contents of notices of appeal, mandates that an appeal must not be dismissed for failure to name a party whose intent to appeal is clear from the notice. Fed. R. App. P. 3(c). Thus,

"under revised Rule 3(c), if it appears on the face of the notice that an appeal is intended by a party not named, then the appeal is deemed well taken." *Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC*, 339 F.3d 1146, 1148 (9th Cir. 2003). "If a court determines it is objectively clear that a party intended to appeal, there are neither administrative concerns nor fairness concerns that should prevent the appeal from going forward." *Id*. at 1149 (citing Advisory Committee Notes to rule 3(c)); *see also Becker v. Montgomery*, 532 U.S. 757, 767 (2001) ("imperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court").

Here, there is no genuine doubt that plaintiff's counsel are appealing the ALJ's grant of an award of sanctions. Plaintiff's counsel prepared, signed, and filed the appeal. Although the sanctions appeal named plaintiff as a party, the Court is convinced that this caused no actual confusion, resulting lack of notice, or other unfairness to defendant. Accordingly, this Court has jurisdiction over plaintiff's counsel's appeal of the sanctions award and need not reach the standing issue.[7]

**B.      Sanctions**

Federal and state law govern the time in which due process requests must be brought to hearing, and provide that the timeline for a due process hearing is tolled for 30 days while the parties engage in a resolution session. On May 22, 2006, the parties met for a resolution session. Jack Bannon, the District's Director of Special Services, and plaintiff's case manager were there to represent the District. Plaintiff's attorneys, Mandy Leigh and Emily Berg, were also present but left the session because they

---

[7]   Plaintiff's argument that plaintiff has standing because the sanctions are inextricably intertwined with the merits of plaintiff's case is without merit. Plaintiff cited *Cunningham v. Hamilton County, Ohio,* 527 US 198, 206 (1999) as support. However, the issue in that case was whether an attorney could appeal a discovery sanction before final judgment had been obtained on the merits of the case. Standing was not at issue and the case has no bearing here.

believed the District's representation was insufficient under IDEA to hold the resolution session. Correspondence between the parties ensued.  Plaintiff's counsel asserted that the District had waived the resolution session by not having proper representation and failing to reconvene, and  that the time frame for the hearing would be abridged.  Defendant's counsel denied waiver, pointed out that to waive a resolution session the parties must agree in writing, and expressly refused to supply a written waiver. On June 13, 2006, plaintiff's counsel filed "Petitioner's Motion for Clarification Regarding Date of Hearing" which requested clarification as to whether, in light of recent events, the date of the hearing was still set for July 6, 2006.

The ALJ found the motion for clarification filed by plaintiff's counsel to be completely without merit and in bad faith.  The ALJ ruled that every reasonable attorney would agree that the motion was totally and completely without merit because (1) the governing statute is unmistakably clear that waiver of a resolution session requires written agreement by both parties and plaintiff's counsel knew that the District had not agreed to a waiver in writing or otherwise; (2) the motion cited no authority itself, failed to acknowledge the District's contrary position or correspondence, and did not set forth any facts in the form of a sworn declaration on which OAH could have based a factual ruling; and (3) plaintiff's counsel did not make any good faith argument for a change in existing law.  OAH Decision at ¶¶ 151-53.  The ALJ found that the motion had been filed in subjective bad faith and for the sole purpose of harassing FUSD because it had "no apparent purpose other than to punish the District for its alleged misconduct in the resolution session . . . and for its refusal to schedule a continuation of that session" and because "neither Leigh or Berg [(plaintiff's counsel)] filed a sworn statement that she acted in good faith or had any reason to believe that the motion had merit."  OAH Decision at ¶¶ 153-54.

Plaintiff contends that counsel's motion for clarification was warranted by defendant's failure

to bring the required educational representatives pursuant to 20 U.S.C. § 1415 (f)(B)(i).[8] Plaintiff cites 34 C.F.R. § 300.510 (Effective October 30, 2007) and Cal. Educ. Code § 56501.5 (Effective October 10, 2007) to show that both the state and federal legislature have since codified the identical request made by plaintiff.[9] Pl's Reply at 15. Plaintiff asserts that "at the time Plaintiff made the request for Clarification of the Hearing Date . . . Petitioner cited the following in support: "the House Committee Report in discussing Resolution Sessions did state that a failure to attend a Resolution Session could impact the timeliness of a due process proceeding. H.R. Rep. 108-77, H.R. Rep. No 77, 108th Cong., 1st Sess. 2003. This language was later codified into state . . . and federal law." Pl's Mot. at 31.

The motion for clarification, however does not contain this language or any other reference to a House Committee Report. *See* Decl. Of Mandy Leigh In Support of Plaintiff's Opposition at ex. B.[10] As the ALJ noted in his order granting sanctions, "while attorneys are entitled to argue in good faith for a change in existing law, [plaintiff's counsel] made no such argument." OAH Decision at ¶ 152. The legal basis of petitioner's motion for clarification was limited to 20 U.S.C. § 1415 (f)(B)(i), which is explicitly contrary to petitioner's sole contention that FUSD had impliedly waived the resolution session. Indeed, in his June 20, 2006 Order on Motion for Clarification, ALJ William Hoover stated,

---

[8] 20 U.S.C. § 1415 (f)(B)(i) states in relevant part, "the local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint . . . unless the parents and the local educational agency agree in writing to waive such meeting."

[9] The Federal and State statutes have identical language: "If the LEA fails to hold the resolution meeting . . . or fails to participate in the resolution meeting, the parent may seek the intervention of a hearing officer to begin the due process hearing timeline." Cal. Educ. Code § 56501.5 (October 10, 2007); 34 C.F.R. § 300.510 (October 13, 2006). However, these statutes did not contain the supporting language on August 24, 2006 when the ALJ granted the motion for sanctions, which explains why plaintiff's counsel failed to cite to these statutes either in the motion for clarification or in the opposition to motion for sanctions. *See* Cal. Educ. Code § 56501.5 (version effective October 7, 2005 to October 9, 2007); 34 C.F.R. § 300.510 (version effective to October 12, 2006).

[10] Although plaintiff mentioned the report in a footnote in plaintiff's opposition to the motion for sanctions, plaintiff did not make an argument for a change in existing law there either.

Petitioner's motion is unsupported by declaration and cites no legal authority for the proposition that a party to a proceeding possesses the power or authority to determine compliance with a statute and/or to fashion a remedy for perceived non-compliance by the opposing party. Given the express language of the statute, it is unclear how Student's counsel could, in good faith, assert such an untenable position.

Index, vol. 6, tab 15 at 3375.

The Court finds the ALJ's decision to grant sanctions against plaintiff's counsel to be supported by a preponderance of the evidence. Accordingly, the Court DENIES plaintiff's request to reverse sanctions and GRANTS defendant's motion as to the sanctions issue.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART defendant's motion [Docket No. 113] and DENIES IN PART plaintiff's cross motion [Docket No. 118] on the issues of parental participation and sanctions. The Court REMANDS on the issue of whether plaintiff received a FAPE, a question that must be reconsidered consistent with the Court's rulings.

**IT IS SO ORDERED.**

Dated: February 22, 2008

_____
SUSAN ILLSTON
United States District Judge