United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.S., a minor, by and through her parents, P.S. and M.S.,<br><br>          Plaintiff,<br><br>  v.<br><br>FREMONT UNIFIED SCHOOL DISTRICT,<br><br>          Defendant.<br>                                           / | No. C 06-07218 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and DENYING PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY** |

On December 2, 2009, the Court heard oral argument on the parties' cross-motions for summary judgment and plaintiff's motion to exclude expert testimony. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby rules as follows.

**BACKGROUND**

Plaintiff K.S. is an eleven-year-old child with autism spectrum disorder. Plaintiff, by and through her parents P.S. and M.S., seeks judicial review of an ALJ decision finding that defendant Fremont Unified School District ("District") provided her with a free and appropriate public education ("FAPE") for the 2003-04, 2004-05 and 2005-06 school years.

The Individuals with Disabilities Education Act ("IDEA") guarantees children with disabilities the right to receive a FAPE designed to meet their unique educational needs. *See* 20 U.S.C. § 1400(d)(1)(A). Plaintiff asserts that the individualized education programs ("IEPs") developed for her by the District in the years in question failed to meet her unique needs. Specifically, she contends she

was capable of making educational progress beyond what the IEPs permitted her to achieve.[1]

Plaintiff initially filed suit in this Court in November 2006, seeking review of the ALJ's August 24, 2006 decision finding that the District had provided her with a FAPE. On the parties' cross-motions for summary judgment, the Court ruled that the ALJ had made erroneous credibility determinations and had improperly relied on the testimony of a single, unqualified expert to determine that plaintiff was severely mentally retarded and incapable of more significant progress than she made under the IEPs at issue. The Court remanded to the ALJ for redetermination of whether plaintiff received a FAPE under the District's IEPs. *See* Feb. 22, 2008 Order at *15.

The remand hearing before the ALJ was held from February 23-25, 2009. *See* ALJ's Decision After Remand (hereinafter "ALJ II"), at 1. The ALJ identified the issues presented on remand as follows:

> a. Whether [plaintiff], in the school years in issue, was capable of making significantly greater progress than she actually made; and
> b. Whether, in light of all of the evidence including that admitted on remand, the District denied [plaintiff] a free appropriate public education in the school years in issue.

*Id.* at 2. During the three-day hearing, the ALJ heard testimony from a total of seven experts, four of whom had not testified at the original hearing. The ALJ also admitted into the record 400 pages of additional exhibits. On May 29, 2009, the ALJ issued a 29-page order again denying relief to plaintiff on the grounds that plaintiff was not capable of making greater progress than she actually made under the IEPs, and that the District therefore afforded her a FAPE. ALJ II at 28.

Plaintiff now seeks review of the second ALJ decision. Presently before the Court are the parties' supplemental cross-motions for summary judgment and plaintiff's motion to exclude the testimony of one of the District's experts, Dr. Bryna Siegel.

///

## LEGAL STANDARD

---

[1] The Court incorporates by reference the detailed factual and procedural background set forth in its February 22, 2008 order (Docket No. 145), *K.S. ex rel. P.S. v. Fremont Unified Sch. Dist.*, 545 F. Supp. 2d 995 (N.D. Cal. 2008).

2

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). The IDEA provides for a cooperative process between parents and schools which culminates in the creation of an IEP for every disabled student. *Id.* § 1414; *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53. The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). Schools are obligated to provide "a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing education.'" *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d 1025, 1033 (9th Cir. 2009) (quoting *Rowley*, 458 U.S. at 197 n. 21, 200).

A court reviewing the decision made after an administrative due process hearing under the IDEA "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The moving party bears the burden of proving that the ALJ's decision was contrary to a preponderance of the evidence. *Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

The Supreme Court has made clear that the IDEA does not grant permission for "courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, courts must give "due weight" to the state court proceedings. *Id.* The definition of the term "due weight" is determined on a case-by-case basis, and the district court has discretion to determine the degree of deference to accord the hearing officer's determination. *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1474 (9th Cir. 1993). "The amount of deference accorded the hearing officer's findings increases where they are thorough and careful." *Wartenberg*, 59 F.3d at 892 (quotation marks and citation omitted).

3

**DISCUSSION**

For the same reasons stated with respect to the ALJ's 2006 decision, the Court grants considerable deference to the ALJ's determination on remand. *See* Feb. 22, 2008 Order at *6. The ALJ heard testimony from numerous witnesses and considered many hundreds of pages of exhibits, and subsequently produced a 29-page written order detailing his factual and legal conclusions. The ALJ's "thorough and careful" approach warrants significant deference. *Wartenberg*, 59 F.3d at 892.

**I.   Motions for Summary Judgment**

Under the IDEA, the key issue that must be decided is whether the IEPs created by the District were "reasonably calculated to enable [plaintiff] to receive educational benefits." *Rowley*, 458 U.S. at 206-07. Plaintiff contends the ALJ erred in determining that the IEPs were reasonably calculated to enable her to make an appropriate level of progress. The crux of plaintiff's argument is that the ALJ improperly labeled plaintiff as cognitively impaired,[2] establishing artificially low expectations that infected his subsequent conclusion that plaintiff made appropriate progress under the IEPs at issue. Plaintiff advances two primary arguments: (1) that a valid determination of her cognitive ability could not be made without an IQ score; and (2) that she did not progress appropriately during the years at issue. Plaintiff also contends that the ALJ erred in making credibility determinations.

**A.   Determining Cognitive Ability without an IQ Score**

Plaintiff asserts in her brief that under the DSM-IV, the diagnostic manual published by the American Psychiatric Association, an IQ score is required to make a determination that a person is cognitively impaired. Plaintiff does not dispute, however, that her eligibility for special education services is based not on the presence of any cognitive impairment, but rather on her autism. As the District points out in its opposition to plaintiff's summary judgment motion, plaintiff "ignores the distinctions between a 'finding' made by an ALJ, an eligibility or unique educational need determination

---

[2] Although the parties' briefs use the terms "mental retardation," "intellectual disability," and "cognitive impairment" interchangeably, the Court will use "cognitive impairment" throughout this order for purposes of consistency.

4

made by an IEP team under the IDEA, and diagnosis under the DSM." Def. Oppo. at 10. The issue before the ALJ, and before this Court, is not whether plaintiff could properly be diagnosed with a cognitive disability under the DSM-IV. Rather, the issue this Court must decide is whether the District's special education services adequately addressed plaintiff's needs, including any cognitive impairment she may have displayed. Therefore, plaintiff's many arguments challenging the qualifications of the District's experts to diagnose cognitive disability are misplaced.

The ALJ acknowledged in his decision that an IQ score is the "most reliable way to determine a person's cognitive capacity." ALJ II at 3. The ALJ noted, however, that it was undisputed that plaintiff's IQ score could not be determined because the manifestations of plaintiff's autism made her "unable to understand, concentrate on, or complete the test." *Id.* In the absence of a valid IQ score, the ALJ considered other measures of plaintiff's cognitive ability in order to determine whether she had a potential for progress beyond what the District's IEPs allowed her to achieve. Plaintiff now contends that the ALJ erred in accepting the alternative measures of cognition advanced by the District's experts.

All of the experts who testified at the remand hearing, both the District's experts and plaintiff's experts, agreed that a valid IQ score could not be obtained for plaintiff due to her autism. Each of the defense experts, however, testified that it was possible to assess a child's cognitive capacity through other means, although they agreed that an IQ test was the most definitive method. Moreover, two of plaintiff's experts, Drs. Leaf and Dr. Friedman, acknowledged that a determination of cognitive capacity, if only a "provisional" one, can be made without an IQ score, although they stressed the importance of IQ as the only definitive measure. *See* AR 4422-23, 4983-84. Although plaintiff asserts that her cognitive capacity cannot be assessed until her autism is brought sufficiently under control to enable an IQ test to be administered, the Court finds that a preponderance of the evidence supported the ALJ's consideration of plaintiff's capacity for progress even in the absence of a valid IQ score.

### B.     Plaintiff's Ability to Make Progress

Although the majority of plaintiff's summary judgment motion is dedicated to arguing that the ALJ erred by considering alternative evidence of plaintiff's cognitive capacity, plaintiff further asserts both in her motion and in her opposition to the District's summary judgment motion that she was

5

capable of a greater level of progress than the IEPs allowed her to achieve. As the question before the Court is whether a preponderance of the evidence supported the ALJ's determination that plaintiff did not show she was capable of more progress, the Court will review each expert's testimony in some detail.

### 1.     Testimony of the District's Experts

The ALJ relied heavily upon expert testimony by Dr. Bryna Siegel, a psychologist who is the Director of the Autism Clinic and Co-Director of the Autism and Neurodevelopment Center at the University of California-San Francisco, and trains school psychologists in diagnosing and treating autism and cognitive disability. After acknowledging that no valid IQ score can be obtained for plaintiff, Dr. Siegel stated that she had employed an alternative method known as "convergent validity," which involved studying all available sources to see if they all pointed to the same conclusion regarding plaintiff's cognitive capacity.[3] *See* AR 4254, 4266-67. Dr. Siegel reviewed the IEPs, the results of the Kaiser cognitive and behavioral evaluations administered in 2004, progress reports, and teacher reports. AR 4263-64. She concluded that plaintiff is "severely" cognitively impaired, pointing in particular to her poor communication, adaptive and generalization skills. AR 4252-56, 4269, 4281. Based on this determination, Dr. Siegel testified that plaintiff was making reasonable progress in the years in question, although she acknowledged that plaintiff's progress was "slow." AR 4256, 4268.

The ALJ also relied on testimony from Dr. Susan Clare, a defense expert who had testified at the 2006 hearing. The ALJ's original 2006 decision had relied almost solely on Dr. Clare's testimony. In its remand order, this Court held that nothing in the record of the prior proceedings "establishe[d] a foundation for Dr. Clare's experience, expertise or credibility with reference to performing cognitive evaluations," and stated that in reconsidering his findings with respect to plaintiff's ability to make progress, the ALJ must rely on "more evidence than the testimony of a single and apparently unqualified witness." Feb. 22, 2008 Order at * 9.

---

[3] Plaintiff moves to strike Dr. Siegel's conclusions on the ground they are not scientifically valid under the standards set forth in *Daubert*. For reasons set forth later in this order, the Court rejects plaintiff's arguments, and will consider Dr. Siegel's report and testimony in determining whether the ALJ's decision was supported by a preponderance of the evidence.

6

On remand, the ALJ heard additional evidence as to Dr. Clare's qualifications with regard to assessing plaintiff's cognitive capacity.[4] The District established that Dr. Clare's credentials as a school psychologist qualify her to make cognitive evaluations for special education purposes. *See* Cal. Educ. Code § 56324(a) ("Any psychological assessment of pupils shall . . . be conducted by a credentialed school psychologist."). Moreover, Dr. Clare testified that she received training in performing cognitive evaluations during her doctoral studies and as part the process of being licensed as a school psychologist. AR 4853-54. Accordingly, the ALJ did not err by considering Dr. Clare's testimony in reaching the decision presently on review.

As noted in this Court's remand order, Dr. Clare testified in 2006 that the results of a test administered to plaintiff in 2004, the Mullen Scales of Early Learning, led her to conclude that plaintiff had "severe" cognitive disabilities. *See* Feb. 22, 2008 Order at *8. The Court also noted that the Kaiser evaluation had specifically declined to make a finding of cognitive impairment. *Id.* at *10. Dr. Clare testified at the remand hearing that alternative methods of assessing a child's cognitive capacity may be more useful than an IQ score in cases, like plaintiff's, in which a valid IQ score cannot be obtained. AR 4872-73. She stated that the Mullen Scales reflect the "developmental delay illustrated by [the] discrepancy" between plaintiff's "relative standing in skills that she is able to exhibit in comparison to those skills generally exhibited by children her age." AR 4889. She also attempted to clarify the fact that her opinion regarding plaintiff's capacity for progress did not depend solely upon the Mullen Scales assessment. Dr. Clare testified that she had also relied on another test, the Vineland Adaptive Behavior Scales, which measures a type of "functioning abilit[y] that standardized IQ measures or intelligence cognitive measures do not cover." AR 4902. Dr. Clare stated that plaintiff's scores on the Vineland Scales also contributed to her conclusion that plaintiff was severely cognitively impaired. AR 4906.

When asked about plaintiff's ability to progress in her education, Dr. Clare stated that autism and cognitive impairment "interact in impact[ing] a person's ability to make progress." AR 4909. Dr. Clare testified that she believed the IEP team was properly addressing plaintiff's autistic behaviors and that plaintiff was progressing at an appropriate rate given her level of impairment. AR 4914, 4917-18.

---

[4] Contrary to plaintiff's assertion, nothing in this Court's remand order prevented the ALJ from considering this additional evidence.

7

Finally, the District presented expert testimony from Dr. Robert Crawford, the psychiatrist who administered the Vineland and Mullen tests to plaintiff at Kaiser in 2004.[5] *See* AR 4654, 4661-62. Dr. Crawford stated that his analysis of plaintiff's cognitive capacity was not conclusive because her autism had hindered her ability to answer some of the test prompts. AR 4662-63. He testified, however, that he had made efforts to administer the tests using techniques that would permit plaintiff to demonstrate her abilities, and stated that he believed plaintiff had severe cognitive deficits. AR 4658, 4663. Dr. Crawford testified that plaintiff's cognitive impairment would "greatly slow her ability to make progress," although he made no specific statements about the level of progress she could be expected to make. AR 4667.

### 2. Testimony of Plaintiff's Experts

Plaintiff presented testimony from three experts, Dr. Ronald Leaf, Dr. Howard Friedman, and Dr. Meredyth Edelson. Dr. Leaf, a licensed psychologist, is currently the Executive Director of the Behavior Therapy and Learning Center and the Co-Director of Autism Partnership, two private organizations that provide therapy and intervention for children with autism. AR 5124-25. While he was a student, Dr. Leaf worked under Dr. Ivar Lovaas, a psychologist who pioneered an autism intervention technique known as Applied Behavior Analysis (ABA). AR 5119. The central focus of Dr. Leaf's testimony was that because plaintiff's autism-related behaviors impede the ability to assess her cognitive capacity, her education must first be focused on bringing her autistic behaviors under control. AR 4349, 4362-63. Dr. Leaf testified that plaintiff could have progressed more quickly if she had been given 30 hours per week of intensive ABA therapy. AR 4378-82, 4389-90, 4396. Citing an article which concluded that three IEPs with the same "eclectic" approach as the IEPs at issue were ineffective when compared to IEPs focusing on ABA therapy, Dr. Leaf stated, "The research has shown overwhelmingly that children with autism need approximately 30 hours of direct structured intervention to make meaningful progress." AR 4389-90, 5036-65.

---

[5] The District also presented testimony from Richard Perlow, an administrator for the California Alternate Performance Assessment, a standardized test for students with cognitive disabilities. Because the ALJ did not rely on Perlow's testimony in formulating his decision, the Court will not address it here.

8

In addition to his testimony regarding ABA, Dr. Leaf also stated that, based on his review of the IEPs and various progress reports, plaintiff should have progressed more than she did during the period at issue regardless of her level of cognitive functioning. AR 4386-87, 4379, 4411. By way of example, he stated that even a student "far below [plaintiff's] apparent abilities" should have been able to learn letter, number, and color identification skills more quickly than plaintiff did during the years at issue. AR 4370. Dr. Leaf stated that certain "prognostic indicators," namely a child's language skills, social interest, engagement in self-stimulatory and/or disruptive behavior, and rate of acquisition of new skills, demonstrate his or her potential for progress. AR 5354-55. Dr. Leaf concluded that plaintiff had a better potential for progress than she was able to realize under the District's IEPs because she possessed some language skills and social interest and displayed disruptive behaviors.[6] AR 4357-58. Dr. Leaf did not address the implications of plaintiff's self-stimulatory behavior, and stated that he could not determine her rate of acquisition due to the insufficiency of her current programming. AR 4358.

Plaintiff's second expert witness, Dr. Meredyth Edelson, is a psychology professor with extensive training and experience in assessing autistic children's cognitive abilities, as well as interpreting such assessments. AR 4722-23. Dr. Edelson testified that, in her view, there is insufficient empirical evidence to support the prevailing view that the majority of autistic children are also cognitively impaired. She stated that many characteristics of autism are often mistaken as signs of cognitive impairment. AR 4736, 5078. Dr. Edelson acknowledged that her views regarding autism and cognitive impairment represent a minority in her profession. AR 4376. Based on those views, however, Dr. Edelson stated that what Dr. Siegel had identified as signs of cognitive impairment, including limited communicative ability, repetitive behavior, and lack of generalization skills, were actually indicative of autism and shed little light on plaintiff's cognition. AR 4759-60, 4766-68. When asked her conclusion regarding plaintiff's educational program, Dr. Edelson stated generally that the IEPs she had reviewed merely "seemed to be re-hashing the previous IEPs that hadn't been showing any

---

[6] As explained in the ALJ's order, Dr. Leaf believes that "[p]erhaps surprisingly, children who exhibit disruptive behaviors . . . achieve a more favorable outcome than those children who are passive. Children with disruptive behaviors clearly are attempting to alter the environment and are responding to environmental factors. Thus it is a matter of teaching them the appropriate behaviors and skills to meet their needs." ALJ II at 14.

9

measurable goals on progress," and were therefore insufficient to meet plaintiff's needs. AR 4753.

Plaintiff's final expert witness was Dr. Howard Friedman, who also testified at the 2006 hearing. As this Court previously found, Dr. Friedman is a clinical neuropsychologist with substantial experience in making psychological assessments. Feb. 22, 2008 Order at *9. Dr. Friedman conducted an in-person assessment of plaintiff in 2006. AR 5004. He stated that plaintiff's cognitive capacity could not be definitively determined because features of her autism, primarily her inattentiveness, interfered with the ability to test plaintiff's cognitive capacity. AR 4968-70. He described attentiveness as a "building block" for other skills, explaining that "attention does have some bearing on cognitive capacity, in part because if you can't pay attention, you can't acquire knowledge." AR 4967. Dr. Friedman testified, however, that it was possible to make a "provisional or a rule-out diagnosis" of cognitive impairment because plaintiff's records demonstrated that cognitive impairment was a "possibility." AR 4984.

Dr. Friedman testified that his review of plaintiff's records had led him to the conclusion that she had actually regressed in her social, communication, and other specific skills due to lack of reinforcement. AR 4978-80, 5005-07. He further stated that the IEPs at issue failed to address plaintiff's attention issues, hampering her ability to make progress on other goals. AR 4970. Dr. Friedman testified generally that he believed intensive ABA therapy is consistently more effective than other approaches to educating children with autism, particularly those with significant attention issues. AR 4988-90, 4995. He admitted, however, that he was not an expert on ABA and did not know whether the theory had evolved since he studied it in graduate school in 1982. AR 4994-95.

### 3. ALJ's Determination Regarding Plaintiff's Ability to Make Progress

After reviewing the qualifications and the testimony of each expert witness, the ALJ concluded that plaintiff had not met her burden of showing she was capable of making more progress than she did during the years at issue. ALJ II at 20. The ALJ found that plaintiff "was making educational progress at the rate reasonably to be expected in light of the nature and extent of her disabilities. The evidence shows that, during those years, [plaintiff] made educational progress that was, for her, both meaningful and significant." *Id.* at 22. He further stated, "The record now shows that the District's expectations for [plaintiff] are not unjustifiably low. They are realistic, and firmly based on [plaintiff's] records and

10

performance." *Id.* at 20. The Court concludes that this determination was supported by a preponderance of the evidence.

### a. ABA Therapy

Plaintiff asserts that the IEPs at issue were deficient because they failed to appropriately target the central characteristics of her autism. Plaintiff's first argument in this regard pertains to the methodology employed by the District's IEPs: she asserts that her IEPs should have included 30 hours per week of intensive ABA therapy in order to address her autism-related behaviors.[7] The Court finds that the ALJ did not err by rejecting this contention. Plaintiff may not, as a matter of law, ask an ALJ or this Court to mandate that the District select a particular educational method among the many alternatives available to it, as long as the alternative(s) the District chose were otherwise sufficient. *Rowley*, 458 U.S. at 208 ("[O]nce a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States.").

Even if plaintiff were entitled to select a particular method, however, she did not prove that the use of ABA was required to ensure she received a FAPE. The ALJ noted that Dr. Leaf's testimony regarding ABA was rather general in nature, and that Dr. Friedman was not sufficiently knowledgeable about ABA to make a recommendation that it be used. Those observations are supported by the evidence in the record. Moreover, two of the District's experts disputed Dr. Leaf's conclusion that increased ABA hours would benefit plaintiff. Dr. Siegel testified that she would not recommend intensive use of ABA therapy for children with poor generalization skills. AR 4310. In addition, Dr. Clare stated that additional ABA therapy would not have benefitted plaintiff because her "profile does not fit." AR 4918. Dr. Clare further pointed out that ABA studies other than those cited by Dr. Leaf have found that as many as 50 percent of children do not benefit from intensive ABA therapy. AR 4925. The ALJ was entitled to accord greater weight to Drs. Siegel and Clare's testimony because it took into account plaintiff's specific characteristics in determining whether additional ABA hours beyond those

---

[7] Although plaintiff's counsel asserted vehemently at oral argument that "this case is not about methodology," the Court sees no other way of characterizing plaintiff's argument that she should have received 30 hours per week of intensive ABA therapy.

11

1 already included in the IEPs would be beneficial; on the other hand, Dr. Leaf simply recommended 30
2 hours per week of ABA therapy as a benchmark standard. Thus, a preponderance of the evidence
3 supported the ALJ's determination on this issue.

### b. **Regression**

Plaintiff's next contention with respect to specific features of the IEPs is that the District failed to provide for reinforcement of prior achievements, such that she actually regressed in some skills. In support of this argument, Dr. Friedman cited an early IEP in which plaintiff's teacher reported that she could match objects, shapes, and pictures, could scribble and use play dough and glue, could place shapes in a foam board, stack blocks, and do puzzles, could use scissors with hand-over-hand guidance, displayed good eye contact, and had some communicative ability and a "short attention span." *See* Oct. 9, 2002 IEP, AR 42. Dr. Friedman asserted that plaintiff's later IEPs, including an unspecified one in which she was described as having "no attention span in a sense," demonstrated that she had lost many of these skills. AR 4980. Dr. Friedman's assertions are not borne out by the record. Even if some of the specific skills mentioned in the October 19, 2002 IEP – an IEP preceding the time period at issue in this case – are not mentioned in the later IEPs, the Court is reluctant to jump to the conclusion that this is because plaintiff had lost those skills through lack of reinforcement. Indeed, as set forth in detail below, the record suggests the opposite: that the foundational skills mentioned in the early IEP were built upon in later IEPs. Plaintiff's argument regarding regression does not provide a reason to disturb the ALJ's determination.

### b. **Recycling of IEPs**

Plaintiff's final argument with respect to the issue of progress concerns the goals and objectives set forth in the IEPs at issue. The IDEA provides that an IEP "must include an assessment of the child's current educational performance [and] articulate measurable educational goals." *Schaffer*, 546 U.S. at 53. One component of this requirement is that the IEP must be amended on at least an annual basis if it is apparent that the child is not progressing as expected. 20 U.S.C. § 1414(d)(4). Plaintiff argues that the District failed to provide plaintiff with a FAPE pursuant to this statutory provision because the

12

1  District simply "recycled" plaintiff's IEPs from year to year with little to no change.

2  In support of plaintiff's contention, Dr. Edelson testified in very general terms that she believed the IEPs were merely being "rehashed" from year to year. The IEPs at issue, however, show a steady progression in goals. For example, plaintiff's October 3, 2003 IEP contained the following goals to be achieved in the upcoming year: (1) identifying uppercase letters and numbers 1-10 when asked to select from 2 choices; (2) identifying the colors red, blue, yellow, and green, and the shapes circle, square, triangle, and rectangle when asked to select from 2 choices; (3) printing her first name from a visual model; (4) following 10 common 1-step prompts, including "clap hands," "sit down," and "stand up"; (5) communicating desires by displaying the words "I want" and any one of a variety of picture icons in response to the question, "What do you want?"; (6) identifying 10 common classroom/household items when asked to select from 2 choices; (7) imitating body movements with physical prompting; (8) independently completing 6 simple work tasks such as stringing beads and sorting like objects; (9) going to the bathroom and sitting down on the toilet 2-3 times per day when shown a photo of the bathroom; (10) using picture icons and/or gestures when involved in interactive activities; (11) participating in "circle time" by imitating the adult's hand movements or actions; (12) expanding her repertoire of foods; and (13) improving the frequency and breadth of her skills in other areas, including completing tasks, using more pictures to state wants, and identifying letters of her name. AR 82-97.

The IEP for the following year, dated September 23, 2004, reported that plaintiff could identify uppercase letters, numbers 1-10, and shapes; trace three of the seven letters in her name; identify familiar objects and foods, including repeating back new words with verbal modeling; use her picture strip to answer the question "I want" with a variety of picture icons; follow some 1-step directions; participate in circle time; and complete work tasks, albeit with some prompting. AR 160. Plaintiff did not, however, achieve her toileting goal, identification of colors, nor some of her goals related to fine motor skills. *Id.* Accordingly, the goals for the following year were revised as follows: (1) identifying 20 of 26 lowercase letters and numbers 1-30; (2) identifying the colors red, blue, yellow, and green; (3) printing her name; (4) following additional one-step directions; (5) identifying 25 common household/classroom items; (6) imitating 10 body movement with physical prompting; (7) completing 9 simple work tasks; (8) going to the bathroom, pulling down her pants, and sitting on the toilet 2-3

times per day when shown a picture of the bathroom; (9) using verbal language, picture icons and/or gestures when involved in interactive activities; and (10) using movement skills such as jumping 2 feet and galloping. AR 161-173.

These two IEPs alone undermine plaintiff's claim that her goals were merely "rehashed" without regard to her progress. As the District pointed out in its briefing and at oral argument, nothing in the IDEA or related case law equates appropriate progress with achievement of each and every goal set forth in the IEP. Such a requirement would be inconsistent with the rule that the reasonableness of an IEP must not be assessed in hindsight, but according to the information that was available to the educators at the time the IEP was drafted. *See Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). In this case, the vast majority of plaintiff's goals were clearly revised or at the very least expanded after plaintiff had achieved the previous year's predictions. The repetition of a single goal – toilet-training – does not demonstrate that the District failed to take account of plaintiff's progress in formulating each successive IEP. The District did not attempt to deny that plaintiff's progress at some goals was slow; in fact, Dr. Siegel stated as much. Slow progress, however, is not necessarily indicative that plaintiff did not receive a FAPE, especially in light of the substantial evidence in the record concerning plaintiff's autism and cognitive impairments. Indeed, the fact that plaintiff achieved but did not surpass the majority of her goals tends to show that the IEPs were designed appropriately. Accordingly, a preponderance of the evidence supports the ALJ's conclusion that, during the years at issue, plaintiff "made educational progress that was, for her, both meaningful and significant." *See* ALJ II at 22.

Plaintiff contends that the ALJ contravened the rule set forth in *Ojai*, a Ninth Circuit IDEA decision that plaintiff asserts is highly factually similar to the present case. *See Ojai*, 4 F.3d 1476. Plaintiff represented at oral argument that the *Ojai* decision mandates that where a child's capacity for progress cannot be definitively determined, the school district should be required to intensify services for a period of one year to see if the child derives any benefit. Contrary to plaintiff's argument, however, *Ojai* is not at all apposite to the present case.

First, *Ojai* involved a child who was both deaf and blind, and therefore required specialized one-on-one education in which the teacher was in constant physical contact with him. *Id.* at 1470. In light of the child's specific limitations, the court determined that an educational placement which would

14

1 provide him with only 6.5 hours per week of individualized instruction was insufficient to meet the
2 school district's obligations under the IDEA. *Id.* at 1276. By contrast, although plaintiff has significant
3 limitations that require a special education plan, she does not have a type of impairment that requires
4 her to receive a specific *form* of instruction, unlike the child in *Ojai*. Second, *Ojai* reached the federal
5 courts after the school district appealed from the hearing officer's decision in favor of the child. Indeed,
6 part of the reasoning underlying the Ninth Circuit's decision was that the district court had failed to
7 accord the appropriate level of deference to the hearing officer's decision. *Id.* Here, the hearing officer
8 ruled in favor of the District, and deference is due to that decision. Finally, even if the facts of this case
9 were more similar to the facts of *Ojai*, that decision does not stand for the sweeping proposition plaintiff
10 attempts to pull from it.

11 On balance, the Court concludes that the ALJ's determination that plaintiff was not capable of
12 greater progress than she was making during the period at issue, and therefore received a FAPE under
13 the District's IEPs, was supported by a preponderance of the evidence.

### C. Credibility Determinations

16 Plaintiff asserts that erroneous credibility determinations alone provide a sufficient ground
17 for overturning the ALJ's decision. The Court has already discussed aspects of some experts' credibility
18 in reviewing the testimony given at the remand hearing. Plaintiff asserts in addition that the ALJ failed
19 to rectify the erroneous credibility determinations identified by this Court in its remand order.

20 In its remand order, this Court determined that the ALJ had erred by making three types of
21 credibility findings. First, the Court held the ALJ erred by finding plaintiff's witnesses less credible on
22 the ground their testimony was at times contrary to the views of District employees. The Court held,
23 "[T]he ALJ's determination that witnesses who had opinions contrary to the District's position were less
24 credible was improper because the District's position is the root of the controversy between the parties."
25 Feb. 22, 2008 Order at *13. Second, the Court held the ALJ erred by finding the District's witnesses
26 more credible on the ground they had more personal experience and interaction with plaintiff. The
27 Court noted that the ALJ had found Dr. Clare's testimony highly credible despite her utter lack of
28 personal contact with plaintiff, and held, "Common sense dictates that witnesses on both sides should

15

be held to the same standards." *Id.* Finally, the Court found that the ALJ had erred by deeming plaintiff's father not credible due to his role as an advocate for plaintiff, while not making a similar negative credibility determination with respect to District witnesses who were acting as advocates for the District. *Id.* at 14.

In his subsequent decision, the ALJ addressed the first and third credibility determinations briefly, noting this Court's ruling and stating that his decision on remand was reached without consideration of the negative credibility finding vacated by the Court. *See* ALJ II at 23 ("No weight is given here to the fact that testimony of some of [plaintiff's] witnesses about [plaintiff's] records contradicted the testimony of the District witnesses who created the records."), 24 ("No reliance is placed here on Father's role in advocating for his daughter. Equal weight is given to the advocacy roles of Father and of the District witnesses."). With respect to the credibility finding turning on the extent of each witness's contact with plaintiff, the ALJ stated on remand, "The significantly greater experience of District witnesses with [plaintiff] is still given some weight here, but it is far from determinative." ALJ II at 23. Under Ninth Circuit case law, although an ALJ may not give *conclusive* weight to the testimony of a school district's witnesses based on their personal experience with the child, *Ojai*, 4 F.3d at 1476, the ALJ is entitled to give *some* weight to that fact, *N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1212 (9th Cir. 2008). Accordingly, the ALJ's credibility determinations on remand do not provide grounds for overturning the ALJ's decision.

Defendant's motion for summary judgment is GRANTED, and plaintiff's motion is DENIED.

## II.     Plaintiff's *Daubert* Motion

Plaintiff moves to exclude the expert testimony of Dr. Bryna Siegel on the ground that Dr. Siegel's use of the "convergent validity" method of assessing plaintiff's records does not meet the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

The District asserts, and the Court agrees, that excluding Dr. Siegel's hearing testimony at this point in the proceedings would only impede the Court's ability to conduct a thorough review of the ALJ's decision. The Federal Rules of Evidence do not apply in administrative hearings. *Glendale Unified Sch. Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1102 (C.D. Cal. 2000) ("[T]he Rules of Evidence

do not apply in administrative hearings; therefore, unless it is unduly repetitious, all relevant testimony should be admitted."). On review of the ALJ's decision, this Court's responsibility is to "receive the records of the administrative proceedings" and, "basing its decision on the preponderance of the evidence, [to] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). It would make little sense at this point to exclude from the Court's consideration testimony that the ALJ considered in reaching his decision.

Even if Dr. Siegel's testimony is not excludable under *Daubert*, however, the Court must consider the validity of Dr. Siegel's methods in assessing whether the ALJ's decision was supported by a preponderance of the evidence. The ALJ relied heavily on Dr. Siegel's expert report and testimony. If there is merit to plaintiff's contention that Dr. Siegel utilized an invalid methodology, there may be insufficient factual support for the ALJ's conclusions.

Plaintiff advances inconsistent arguments in favor of excluding Dr. Siegel's testimony. In her *Daubert* motion, she asserts that the convergent validity method is "novel," "unreliable," and "not based upon a sound scientific foundation." Pltf's *Daubert* Mot. at 2, 5. In her reply brief, however, plaintiff "concedes that convergent validity is a valid term with a reliable foundation that rests in psychology," but challenges Dr. Siegel's execution of the technique. Pltf's Reply in Supp. of *Daubert* Mot. at 3. An expert declaration submitted with plaintiff's reply brief states that convergent validity is not meant for use with measures that are not specifically intended to test intelligence. *See generally* Decl. of Alan Kaufman. In the declaration, Dr. Kaufman states that Dr. Siegel "misuses the term convergent validity and moreover, her use of the term convergent validity as a means of diagnosing severe intellectual disability is not recognized by professionals at large." *Id.* ¶ 13.

The Court is not persuaded that the ALJ erred by relying on Dr. Siegel's testimony. Even if Dr. Siegel wrongly labeled her analytical technique, the method she employed – reviewing plaintiff's records and forming a conclusion regarding plaintiff's cognitive capacity based on that review – was essentially the same method employed by the majority of the other experts who testified at the hearing, both for plaintiff and for the District. Accordingly, the Court finds no basis for disturbing the ALJ's reliance on Dr. Siegel's testimony.

Plaintiff's motion to exclude Dr. Siegel's expert testimony is therefore DENIED.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant's motion for summary judgment (Docket No. 193), DENIES plaintiff's motion for summary judgment (Docket No. 195), and DENIES plaintiff's motion to exclude (Docket No. 190).

**IT IS SO ORDERED.**

Dated: December 29, 2009

SUSAN ILLSTON
United States District Judge